FILED

## UNITED STATES DISTRICT COURT
### Eastern District of Virginia
### Alexandria Division

2016 MAY 13  P 1: 45

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

**BRIAN C. DAVISON**

**Plaintiff,**

v.

**DEBORAH ROSE, TRACY STEPHENS, ERIC HORNBERGER, JILL TURGEON, BRENDA SHERIDAN, JEFFREY MORSE, WILLIAM FOX, KEVIN KUESTERS, JOY MALONEY, ERIC DEKENIPP, AND SUZANNE DEVLIN,**

**in their official and individual capacities,**

Case No.: 1:16CV540
AJT/MSN

**AND**

**LOUDOUN COUNTY SCHOOL BOARD**

**Defendants.**

## COMPLAINT

Plaintiff, Brian C. Davison (hereinafter "Davison"), by undersigned counsel, brings this Complaint against Loudoun County School Board, Deborah Rose, Tracy Stephens, Eric Hornberger, Jill Turgeon, Brenda Sheridan, Jeffrey Morse, William Fox, Kevin Kuesters, Joy Maloney, Eric DeKenipp, and Suzanne Devlin for violations of his First and Fourteenth Amendment rights and for violation of 28 U.S.C. 1983. In support thereof, the Plaintiff states as follows:

1

## JURISDICTION AND VENUE

This action arises under U.S. Const. Amend. I and XIV and the Plaintiff seeks remedies under 42 U.S.C. § 1983. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and by pendent jurisdiction as to the state law claim made herein.

Venue lies in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b). Defendants are Loudoun County School Board is a government agency located within the jurisdiction and each defendant is a resident of this jurisdiction. Substantially all events or omissions giving rise to this claim occurred in this jurisdiction.

## PARTIES

1.      Davison is a resident of Loudoun County, Virginia and the father of two children who attend Seldens Landing Elementary School, a public elementary school in the Loudoun County Public Schools ("LCPS").

2.      At all times pertinent to the claims made herein, each of the defendants acted, individually and in concert with others not named herein, under authority of the color of state law to violate and interfere with the exercise of rights guaranteed to Plaintiff under the Constitution of the United States

3.      Defendant Loudoun County School Board ("LCSB") is the public governing body vested by law with the power and authority to administer public education in Loudoun County, Virginia. The Board consists of nine popularly elected members.  During the period of time embracing the controversies pertinent to the claims made herein, an election was conducted in the fall of 2015 and four members were elected who took office in January of 2016, replacing individuals who served on the board during the other times of the controversy.  LCSB manages

and administers the public schools of Loudon, sometimes referred to as Loudon County Public Schools and referred to hereinafter as LCPS.

4.      Defendant Tracy Stephens (hereinafter "Principal Stephens") is currently, and has been at all time pertinent to the claims raised herein, the principal of Seldens Landing Elementary School employed by LCSB.

5.      Defendants Deborah Rose, Eric Hornberger, Brenda Sheridan, Jeffrey Morse and Jill Turgeon are currently, and have been at all time pertinent to the claims raised herein, elected members of LCSB.

6.      Defendant William Fox and Kevin Kuesters were elected member of LCSB at times pertinent to the claims raised herein until January 4, 2016.

7.      Defendant Joy Maloney and Eric DeKenipp are currently elected member of LCSB having been sworn in on January 4, 2016.

8.      Defendant Suzanne Devlin is currently, and was at all time pertinent to the claims raised herein, employed as the LCPS district security supervisor.

9.      Virginia Patterson is currently, and was at all time pertinent to the claims raised herein, employed as the LCPS Director of School Administration.

## FACTS

10.      Commencing in or about the month of January of 2015, Defendants individually and in concert with each other undertook a course of conduct to restrict Plaintiff's public discussion of the LCSB's administration of the SOL (Standards of Learning) program, and the receipt of federal funding, in the Loudoun County school system, generally, and Seldens Landing

**DAVISON V. ROSE, et.al**
*Complaint*
Page **4** of **68**

Elementary School, particularly, and how LCSB's administration of said program violates, in

Plaintiff's understanding, the federal rules and regulations governing the program.

11.     Specifically, federal law requires that local school governing bodies which

receive federal education grants subject students to standardized testing (SOLs) at defined grades

and for defined subject areas. Further, school districts which received waivers to the No Child

Left Behind Act (NCLB) were required to provide student growth data summarizing each

teacher's success in preparing their respective students for such tests to the individual teachers

and use the data in teacher evaluations. That student growth data is referred to as Student Growth

Percentiles (SGPs) in Virginia. In addition, federal regulations restrict schools' ability to reveal

educational records under the Federal Education Records Privacy Act (FERPA). LCPS' "retest"

policy for students who fail to meet the benchmark scores on the SOL test publicly revealed

students who failed the SOL and therefore violated FERPA.

12.     During the commencement of the 2014-2105 academic year, Plaintiff learned that

LCSB denied receiving the SGP data for the teachers employed by it and that LCSB was not

making the data available to its teachers nor using the data in teacher evaluations. LCSB denied

that the SGP was available or that it had an obligation to disseminate the SGP data upon receipt

of a Freedom of Information Act (FOIA) request.

13.     At Back-to-School night in September of 2014, Davison learned from Principal

Stephens that the school system had a type of value-added metric (VAM) that could be used to

help parents measure their child's learning. Davison had been interested in this type of VAM for

years and had previously raised the issue with LCSB and Principal Stephens.

**DAVISON V. ROSE, et.al**
*Complaint*
Page 5 of **68**

14.     Following his conversation with Principal Stephens, Davison sent an email to LCSB chairman Hornberger and Loudoun Superintendent Eric Williams requesting more information about the VAMs. Neither Hornberger nor the superintendent responded.

15.     Davison spent several days researching and discovered that Virginia Department of Education (hereinafter "VDOE") and Loudoun County received billions of dollars from the U.S. Department of Education, in part, to develop a type of value-added metric called Student Growth Percentiles (hereinafter "SGPs"). Unlike raw standardized test data that only measures how much a child knows, SGPs can help measure how much a child has learned during a given school year.

16.     VDOE and LCSB received additional federal money through the Elementary and Secondary Education Act ("ESEA") waivers (also known as NCLB) by submitting written assurances that VDOE and LCSB had aggregated SGPs by school and by teacher, disseminated this information to the teachers, and used the data in principal and teacher evaluations.

17.     LCSB has never used SGPs in teacher evaluations.

18.     After several unsuccessful attempts to discuss SGPs with LCSB and other employees of LCPS, Davison submitted requests to LCSB and VDOE pursuant to Virginia's Freedom of Information Act ("VFOIA"). He requested the two public agencies provide him copies of Loudoun County SGP scores organized by school and by teacher.

19.     Both governmental agencies refused and Davison filed a Petition for a Writ of Mandamus in Richmond Circuit Court. Ultimately, the state court entered a series of rulings denying the government's demurrer, overruling the government's claimed exemptions, ordering

**DAVISON V. ROSE, et.al**
*Complaint*
Page 6 of **68**

the government to produce the requested records, and requiring the government to pay Davison

$35,000.00.

20.    Davison's suit garnered significant public interest. The Washington Post reported

the story on page A1 and ran several follow-up articles. Other newspapers, including the

Associated Press, Yahoo News, Loudoun Times, and Leesburg Today, also reported the story

that received thousands of reader comments.

21.    Davison received the first set of SGP data in February of 2015. A few weeks

later, Davison met with Principal Stephens and provided her copies of the SGP scores for

Seldens Landing Elementary School. The scores indicated Seldens Landing's math instruction

ranked 899 of 1142 Virginia schools.

22.    Davison asked the Seldens Landing parent teacher association ("PTA") to hold an

information night to disseminate SGP information to other parents. The PTA president initially

promised to disseminate SGP information in the PTA newsletter and to consider hosting a SGP

informational meeting. She ultimately changed her mind after Principal Stephens, a board

member of the PTA, advised that the PTA was an extension of the school and the SGP data

would reflect poorly on the school. Principal Stephens has blocked Davison from even raising

the subject of SGP scores in subsequent PTA meetings.

23.    Davison also raised other issues of public concern with LCSB, Seldens Landing

PTA, and the public at-large including:

a.    Davison learned multiple LCPS high schools had participated in an

international test that allowed for comparisons of student skills across the US and nations around

the world. Each LCPS high school performed worse than similar students in the US and across

6

all 34 OECD (Organisation for Economic Co-operation and Development) nations on the

Programme for International Student Assessment "PISA" test. Upon learning of the report,

Davison called for the resignation of senior LCPS officials. LCPS would subsequently remove

all high-profile links to the PISA brief on its official website, including prominent links on its

"Vision 20/20" initiative, leaving only a single, obscure link buried on the LCSB document

website. Davison also learned through his FOIA requests that LCPS would partner with the

Global Learning Network to host a mid-Atlantic conference for school districts administering the

PISA test in May 2015. However, after Davison's public criticism of LCPS performance in

March 2015, LCPS chose not to publicize the conference in any way.

      b.    Davison called attention to LCPS' new practice of retesting students who

failed the SOL tests. No student suffered any negative consequence from failing the SOL test

and publicly, most LCPS officials criticized the SOL tests are harmful to students. However,

LCPS officials including Principal Stephens pressured students who failed to retake the exam

solely so the school could receive higher marks.

      c.    Davison learned the chairman of LCSB worked as the executive director

for charter school magnate Dennis Bakke's philanthropic foundation. Bakke's privately-owned

charter school company, Imagine Learning, had hired a sitting Loudoun Supervisor to serve as its

spokesperson in 2010 and sought to open charter schools in Loudoun at that same time. Since

Defendant Hornberger had never disclosed his relationship to Bakke despite being an ardent

charter supporter and voting on charter issues while on LCSB, Davison filed suit in Loudoun

Circuit Court. The case is currently under appeal with the Virginia Supreme Court.

        d.      Davison called for LCPS principals and teachers to provide individualized student growth reports to all parents. Such reports were included as a feature of the online educational software used by LCPS – iReady. Davison had first received an iReady report for his child at his first conference with Principal Stephens in October 2014, but Stephens would repeatedly refuse to proactively issue them to parents or even make parents aware of their existence. Davison had to raise the issue with Assistant Superintendent of Education Cynthia Ambrose in December 2015 when Stephens refused to stop providing iReady reports to Davison.

        e.      Davison requested a complete list of Loudoun teacher salaries via FOIA in March 2015 after suspecting senior LCPS officials of providing intentionally misleading information in the FY16 budget discussions. When LCPS refused, Davison took LCPS to court but would eventually lose despite LCPS never providing the salary information. A more narrowly focused FOIA request in July 2015 provided Davison with the requested salary information. Using that data, Davison:

        i.      Revealed that LCPS had publicly lied about not providing any teacher step increases for the past 6 years. Teachers had received step increases from FY12 forward.

        ii.      Revealed that LCPS had inflated its estimates of teacher step increases by over 50%. LCPS would subsequently reduce its estimate in the final FY17 budget from $16.8M to $10.3M, a reduction of over $6M/yr.

        iii.      Revealed LCPS provided false information to LCSB and the public regarding the distribution of teachers by degree. LCPS reported 70% of its teachers held only Bachelor's degrees with a lower salary when in reality 15% possess only a Bachelor's.

24.     Davison realized LCSB had evaluated 99.5% of Loudoun as teachers effective and would resist any efforts to incorporate objective data into teacher evaluation. He undertook what he characterized as an awareness campaign to push for transparency and advocate for honest evaluations:

a.     Davison started a Facebook and a Twitter account wherein he posted hundreds of relevant articles and comments. He also posted thousands of comments in various online forums such as the comment sections of online newspapers. He attended numerous PTA meetings, school board hearings, board of supervisor hearings, and other public meetings where he spoke during the open comment sessions.

b.     Davison frequently spoke on topics like SGPs, the lack of transparency in local government, the undisclosed conflict of interests on various school board members, the school budget, and violations of federal privacy laws designed to protect student privacy.

c.     He publicly called for the resignation of several senior LCPS officials when he learned the results from the PISA test administered by the OECD. The test results showed Loudoun students performed worse in all subject areas than similarly situated students in every other country including Mexico.[1]

d.     Davison filed four complaints against LCSB, Defendant Hornberger, Defendant Morse, Defendant Sheridan and other members of LCSB in Loudoun County Circuit Court requesting the state court require LCSB to comply with FOIA disclosure and production requirements and Virginia's conflict of interest laws.

---

[1] PISA results

   e.  In October of 2015, Davison reported to the Virginia State Police ("VSP") an incident of alleged perjury and fraud committed by Julia Judkins, outside counsel for LCSB, Steven DeVita, internal counsel for LCSB, and William Byard, the information officer for LCSB. Special Agent Kinnard of the VSP investigated the claim and referred the case for further prosecution to Jim Plowman, the Loudoun County Attorney (LCA), but Mr. Plowman has refused to review the evidence or to prosecute. In February 2016, Davison filed a civil rights complaint under 42 USC 1983 against LCA Plowman for censoring his comments on Plowman's public Facebook page. That case is now pending in federal district court.

25.  At times, Davison disagreed with other commenters or ridiculed the Defendants and other LCSB employees for their refusal to discuss issues or efforts to suppress information.

26.  During those discussions. Davison stated he would take disagreements to court or suggested that he would post the disagreement in a publicly viewable online forum.

27.  At no time in any of his commentary or advocacy did Davison threaten physical harm or in any way suggest violence.

28.  Defendants LCSB, Deborah Rose, Tracy Stephens, Eric Hornberger, Jill Turgeon, William Fox, Kevin Kuesters, Jeffrey Morse, Joy Maloney, Eric DeKenipp, Brenda Sheridan and Suzanne Devlin jointly and separately undertook actions to stop Davison's participation and advocacy.

29.  Defendants used county funds and the powers and authority afforded to them by their employment with LCPS or their positions on the School Board to prevent Davison from speaking at meetings, posting in public forums, participating in his children's education, attending public events, and otherwise engaging as a member of his community.

30. These incidents include but are not limited to the following:

a. In March of 2015, Davison attended a PTA meeting and asked about SGPs during the Principal Q&A time. This time is open for any attendee to ask the principal any questions pertaining to the schools. Principal Stephens immediately shut down the discussion and advised Davison that SGPs would not be discussed as they were not part of the agenda.

b. Each of the elected members of the LCSB was provided by the Loudoun County local government with the opportunity to establish an official Facebook social media page. Citizens were enabled to interact with the elected official and other citizens on those social media pages by posting comments engaging in public discussion. Plaintiff posted comments critical of the LCSB and the elected officials regarding the SGP and SOL and other issues.

c. Defendant Eric Hornberger is Davison's representative on the local school board. Individuals receive over $35,000 per year in stipends and health benefits for serving on LCSB as compensation for their various methods of public outreach and their official duties. Hornberger does not host office hours, constituent forums, promulgate newsletters, or hold any other regularly meetings to dialogue with his constituents. His main form of communication is a "public figure" Facebook page that is used to post highlights of LCSB meetings and other matters related to the school board. He invites community comments on issues before the school board and often holds extensive online conversations with his constituents through this Facebook page. In January of 2015, Defendant Hornberger deleted Davison's comments from this Facebook page without notice or a hearing. Defendant Hornberger subsequently banned the Davison from posting any comments.

d.      Once Davison publicized that Hornberger was hiding Davison's innocuous posts on official Facebook pages (e.g. Why doesn't LCPS publicize private sector equivalent pay for its teachers?), Hornberger falsely accused Davison of threatening his life.  Hornberger contacted Defendant Devlin and together they arranged to have Devlin surveil Davison at future LCSB meetings and contract with LCSO for law enforcement presence as well.  Both would allege to off-duty LCSO officers providing security coverage for LCSB meetings and numerous LCPS staff that Davison had made threats against Hornberger's physical safety.

e.      Davison is the only user that has been banned from posting on Defendant Hornberger's Facebook page.

f.      Other LCSB members also maintain "public figure" Facebook pages that are used to update constituents on school board matters. Members of the public are allowed to post comments on these Facebook pages and the LCSB members frequently respond to these comments. Over the spring and summer of 2015, Defendants Fox, Rose, Turgeon, and Kuesters blocked Davison from posting any comments or questions on their official Facebook pages. All defendants were members of the LCSB at the time they blocked Davison.  Following their election to the school board, Defendants DeKenipp and Maloney would also block Davison from posting to their official "public figure" Facebook pages.  Defendant Morse blocked Davison from his campaign page in the summer of 2015.  Morse continued to use his campaign Facebook page after the election, effectively converting it into a public figure Facebook page subject to public forum guarantees.

g.      The significance of these official Facebook pages was demonstrated during an LCPS rezoning process in February 2016. Citizens became concerned that certain

rezoning plans for the Leesburg area schools amounted to segregation of students by race and socioeconomic status. Very active discussions started on the Facebook pages of the local Loudoun newspapers and included several school board members and Davison. Very soon, school board members moved all of their discussions to their official Facebook pages from which Davison was banned. Davison was left to provide analytical commentary on the local newspaper and community interest Facebook pages despite most of the activity moving to the LCSB pages. Many Loudoun citizens would use statistics generated by Davison in their arguments and LCSB members, including Rose, would attempt to tangentially refute comments by Davison.

        h.    LCPS also maintains an official Loudoun Schools Facebook page on which it allows constituents to make comments and/or provide support for each comment. Davison posted critical comments regarding LCPS' subpar PISA test results on a Back-to-School video created by Superintendent Williams in August 2015 just two months prior to the LCSB election. LCPS officials deleted only Davison's critical comments from the Facebook page multiple times as Davison continued to repost them. LCPS stopped accepting new comments on its Facebook page for the duration of the 2015 election cycle rather than restore Davison's critical comments. Once the election was over, LCPS restored the ability for all to comment on its public Facebook page. On September 10, 2015, LCPS posted "Terms and Conditions" on its official Facebook page claiming the page represented neither a public, limited public, or even designated forum. As such, LCPS claimed it could restrict comments at will and permanently ban any citizen who violated it conditions a mere three times.

i.      Davison has never been provided notice or a hearing regarding his ban from the various public figure Facebook pages.

j.      Defendant Fox acknowledged in an email that the school board had "censored" and "stonewalled" Davison.

k.      In February of 2015, LCSB revised its official rules to prevent speakers from making any criticism of specific board members during the public comments section of school board meetings.

l.      When Davison questioned the constitutionality of the school board's rule, Defendant William Fox informed Davison that Fox had a JD degree, had been admitted to practice law in several state bars, and had consulted in 42 USC 1983 cases in the past. He advised the Davison that the policy was constitutional and that Davison would be shut down if he targeted individual board members in his comments at the next meeting.

m.      In various public hearings since that time, Defendant Hornberger and Defendant Rose have interrupted Davison's comments to such an extent that the interruptions consumed large portions of Davison's allotted speaking time and materially limited Davison's participation in the public forum. At times, Defendant Rose's interruptions were no more than a call to shut down Davison's speech or to express her personal dislike of Davison. In a March 14, 2016 public LCSB meeting, Defendant Rose requested a sheriff's officer providing security at the meeting to order Davison to leave the premises. The officer had been previously called to Rose's home in early 2015 when Rose made a frivolous harassment complaint against Davison.

n.      Davison has never observed any board members interrupt other speakers for more than a few seconds during public commentary in the numerous meetings and hearings he has attended.

o.      In a June 23, 2015 LCSB meeting, Defendant Rose once again interrupted Davison during Davison's allotted speaking time and consumed substantially all of Davison's speaking time. Defendant Rose stated that her husband filed a criminal complaint against Davison with the Loudoun County Sheriff's Office alleging that Davison made threatening comments against Defendant Rose and Defendant Rose's children.

p.      The Sheriff's office investigated this complaint and dismissed the allegations as unfounded.

q.      Defendant Rose also contacted Davison's parents by phone and alleged Davison threatened her and her children.

r.      Following the Sheriff's office dismissal of her husband's criminal complaint, Defendant Rose contacted Davison's employer alleging Davison threatened Defendant Rose and her children.

s.      Principal Stephens and LCPS officials held a meeting with other staff members at Seldens Landing to discuss Davison. An employee of LCPS would report Davison to child protective services ("CPS") using information gathered in their official duties. In support of the report, the staff made written statements incidents such as Davison's 9-year-old daughter being unable to play kick-ball one day because she "was sent to school in rain boots."

t.      CPS contacted Davison shortly after the meeting Seldens Landing faculty but refused to identify the reporter. CPS officials told Davison the existence of a flyer criticizing

**DAVISON V. ROSE, et.al**
*Complaint*
Page **16** of **68**

his children's principal for FERPA violations was the cause of concern. CPS investigated the matter and quickly dismissed all allegations as unfounded.

u.     In May of 2015, Davison expressed his concerns to Principal Stephens about Seldens Landing's Standards of Learning Test ("SOL") retake practices. Because students who failed the SOL were sent out of the classroom to retake the test, Davison worried other students in the class would identify the students who failed the SOL by which students were being sent out of the class. Principal Stephens assured Davison that the other students would not know the reason the retake students left the room. A few weeks later, Davison's daughter returned home and identified a boy in her class who had been teased because he retested after having failed the original SOL test. The classroom teacher had informed her students that at least one student had failed the math SOL.

v.     Davison raised the issue of student privacy again during the Q&A session at the September 22, 2015 PTA meeting. Principal Stephens told Davison she would return to his question and then spent approximately fifteen minutes answering several questions from other parents about field trips. After fifteen minutes, Davison rose to leave the meeting due to a scheduled call with Richmond Circuit Court. Principal Stephens turned to address Davison as he was leaving. Davison apologized for having to leave but recounted the events in his daughter's class and reiterated his concern for student privacy related to the SOL retake policy. Principal Stephens attempted to interrupt Davison's recitation and Davison spoke over her. He left after his recitation.

w.     As Davison was leaving the school cafeteria, Principal Stephens chased after him and reprimanded him for asking his question. She threatened to ban him from school

property if he asked similar questions in the future. Davison ignored Principal Stephens as he was late for his call and Principal Stephens shouted after him, "Don't you walk away from me! I'm still talking to you." Davison paused as he was leaving the building to inform Stephens that he would protect his rights in federal court.

  x. Just hours after Stephens threatened to ban Davison from Seldens Landing grounds, LCSB held a closed meeting to discuss a "threat to public safety" during its September 22, 2015 board meeting. Shortly thereafter, Defendant Stephens delivered to Plaintiff a letter from her dated September 29, 2015, (Exhibit 1) informing him that he was barred from entry onto any school board property for the balance of the 2015-2016 school year upon threat of arrest for criminal trespass. A second "corrected" letter dated October 8, 2015, was then delivered to him (Exhibit 2). Shortly thereafter, a third letter (Exhibit 3) was delivered to him dated October 14, 2015.

  y. The first two letters also required Davison to submit requests to visit the school to Principal Stephens two days in advance of any desire to attend a matter related to his children. Davison was immediately banned from all group events at which other parents might be present. Two "corrected" versions issued over the following two weeks modified this ban to be complete and absolute for the remainder of the year.

  z. All letters were issued without a prior hearing.

  aa. This ban materially affected Davison's ability to participate in his children's education and participate in all events held at Seldens Landing. Specifically:

      i.      Davison had attended the Seldens Back-to-School night in September of 2015. He scheduled teacher conferences for October 2015 but was unable to attend because Principal Stephens refused to grant permission.

      ii.      Davison made multiple attempts to contact his children's teachers by phone or email in the following six months, but was informed that he was not allowed to communicate by phone or email with the teachers. All emails from Davison to his children's teachers were intercepted by LCPS and re-routed leaving Davison no open channels for contact with his children's teachers.

      iii.      Davison was not allowed to pick up or drop off his children at school. His daughter arrives early two days per week for safety patrol and chorus practice. Unlike all other parents who can drop their children off at the school's front entrance, Davison is the only parent who must park across the street and escort his children to the school boundary even in sleet or rain.

      iv.      Davison was not allowed to attend after school events held at the school and otherwise open to the public such as PTA fundraisers like "Spooky Bingo" which his children strongly wished to attend.

      v.      Davison was excluded from all in-school events at Seldens Landing like his daughter's chorus recitals, his son's field day, a student mock trial, or their science fair demonstrations.

      vi.      Davison was unable to attend PTA meetings that are held at the school despite being a PTA member.  At each PTA meeting, Principal Stephens conducts a Q&A to allow parents to address any topic of their choice with her and in front of the other parents.

vii.     Davison has been banned from all Seldens Property even after school hours and on the weekends. Seldens playground is, by policy, open to the public and was frequently used by Davison and his children prior to the ban including teaching his kids to learn to ride their bicycles.

31.     The ban also imposed emotional distress on Davison and his children.

a.     Immediately after the No Trespass ban, Defendant Devlin arranged a knowingly unnecessary show of force at Seldens Landing using contracted LCSO officers in an attempt to justify the ban among parents and staff. When Davison's ex-wife, Rattiya Maneesri, picked up their children from afterschool activities in October 2015, she observed multiple LCSO officers dressed in full tactical gear, along with LCPS Security Supervisor Suzanne Devlin, escort Davison's children from the classroom to the school office prior to their dismissal. Previously, Maneesri had been allowed to pick up the children from the classroom. No other children were escorted to the front office in this manner.

b.     Defendant Stephens attempted to bar Davison from picking up his own children after school on October 15, 2015. Despite providing ample notification as the No Trespass letters prescribed, Principal Stephens and Devlin initially refused to release Davison's children to him. According to the LCSO officer on scene, Stephens demanded "I WANT HIM ARRESTED!" After Davison spoke to the LCSO officer on the phone and asked him to bypass Devlin and speak directly with Major Fraga of LCSO, the officer would arrange to release the children to Davison. Approximately 25 minutes after their scheduled release time, two LCSO officers and Principal Stephens escorted Davison's two frightened children 100 yards from the school entrance to the property line. Stephens forcibly shoved the third version of the No

Trespass letter into Davison's torso and demanded he accept it. Davison defused the situation by accepting the letter and beginning a five-minute conversation with the two officers about their jobs and all of their equipment. The children quickly forgot about being frog marched out of school by two fully equipped officers and peppered the officers with questions about their gun, baton and handcuffs. Davison then took his children for ice cream to settle them down.

      c.    Davison's children repeatedly asked him if he would be arrested due of the presence of LCSO officers upon their arrival and dismissal from school.

    32.    Davison requested the ban be lifted and/or LCPS provide a meaningful procedure to appeal the ban within days of receiving the first No Trespass letter.

      a.    Principal Stephens refused to lift the ban but eventually LCSB provided an appeal process in the third "corrected" letter. Defendant Devlin was copied on each version.

      b.    The 3rd version of the LCPS No Trespass letter issued on October 14, 2015 banned Davison from all Seldens activities for the duration of the school year without exception. It referenced LCSB policy 2-20 for appeals of administrative decisions which requires LCSB to hear and issue a ruling on any administrative appeal within 30 days.

      c.    Davison issued his first appeal on October 4, 2015, four days after receiving the first No Trespass letter. In all, Davison would appeal at least four separate times to both Superintendent Williams and LCSB prior to his nominal board hearing. LCSB would not complete its hearing on the appeal until November 23, 2015, a full fifty (50) days after Davison's appeal was first issued.

      d.    In contradiction to LCSB policy 2-20, an intermediate LCPS official was inserted into Davison's appeal process. Director of School Administration Dr. Virginia Patterson

supposedly conducted this intermediate appeal but initially informed Davison on two separate

occasions she was following LCSB's guidance in the No Trespass order.

33.     Davison requested LCSB lift the ban multiple times and provided the following

information to the LCSB and Defendants Rose, Stephens, Fox, DeKenipp, Morse, Hornberger,

Turgeon, Kuesters, Maloney, Sheridan, and Devlin:

        a.     Each time Davison has attended a meeting or event at Seldens Landing, he

has gone directly to the designated area, stayed within the designated time, and complied with

directions of Seldens Landing staff.

        b.     Davison has never interrupted student instruction during any of his visits.

        c.     Davison has never been requested to leave the school or any other event.

        d.     Davison has peacefully participated in all school activities without

incident.

        e.     Davison is a graduate of Massachusetts Institute of Technology ("MIT")

with a Bachelor of Science and a Master of Engineering.

        f.     Davison honorably served as a United States naval officer in the nuclear

submarine force for seven (7) years prior to his honorable discharged in 2002.

        g.     Davison has been gainfully employed since his discharge from the US

Navy.

        h.     As a condition of his employment, Davison has successfully undergone

four extensive background investigations from the Department of Defense (DoD). He has

continuously held a secret (or higher) DoD clearance for over a twenty year period. Davison

obtained copies of his security investigations from his employer and provided LCSB and the

Defendants copies.

        i.      Davison has never been convicted or even accused of a crime other than

minor traffic infractions.

        j.      Davison has never been accused of violence nor has he advocated

resolving problems with violence.

        k.      Davison provided the names of people who attended various LCPS

meetings with Davison and who could testify to appropriateness of Davison's participation. In

that list was the name of a Loudoun County sheriff officer who attended numerous events with

Davison at the school's request, including the September 22, 2015 PTA meeting, and who found

no cause for concern.

        l.      Davison provided letters from various unrelated individuals who had

opportunity to witness Davison's interaction at Seldens Landing and other public hearings and

stated they found Davison's actions to be appropriate and respectful.

        m.      Davison provided the names of several people who had known Davison

for years and who could affirm that Davison has never resolved matters with violence.

        n.      After the ban from Seldens, Davison has attended without incident a

Seldens Landing's PTA fundraiser at an ice skating rink, a Seldens Landing "Wacky Teacher

Olympics" at a nearby school, and Seldens Landing chorus concerts both at another LCPS school

and a professional baseball stadium. Each event was attended by teachers, parents and students

from Seldens Landing and was held without incident.

o.    Davison is a member of the Trailside Middle School (TMS) and Frederick Douglass (FDES) PTAs.  After the ban from Seldens Landing, FDES, Belmont Ridge Middle School (BRMS) and Freedom High School (FHS) welcomed Davison for their 2015 Veterans Day celebrations.  FDES invited Davison on stage during a special school-wide Veterans Day ceremony.

34.    Davison made multiple attempts to provide LCPS officials and LCSB members with current case law information regarding No Trespass bans:

a.    On December 6, 2015, Davison provided all LCSB members with case law demonstrating that its ban was unconstitutional.  Davison was concerned that LCPS attorneys might not have provided a complete summary of the current case law and thus included court opinions for Cole v Buchanan, Cyr v ARSU, and Ritchie v Coldwater Community Schools.

b.    After being denied a chance to speak with his children's teachers regarding their instruction, on December 10, 2015, Davison reiterated his request and provided the court's opinion in Meyer v Nebraska to Principal Stephens and Dr. Patterson.  Davison also enumerated his concerns about the instruction provided to his children at Seldens Landing in the email.

c.    On January 27, 2016, Davison emailed the new LCSB to request a vote on rescinding his ban.  He provided each of the school board members a copy of his previous appeal information.  He also provided additional case law including Adcock v Board of Education, Huminski v Corsones, Johnson v Perry, and Barna v Board of Education in addition to the previously cited cases of Cole, Ritchie, and Cyr.

d.     The current LCSB has never taken a public vote on whether to uphold or rescind Davison's ban.  LCSB member Tom Marshall informed Davison in spring of 2016 that he had attempted to call for a vote on Davison's ban with each individual board member but no other LCSB member would entertain the motion.

e.     Defendant DeKenipp informed Davison in a March 2016 public forum held at Frederick Douglass Elementary School to discuss a rezoning vote that he read "everything" that Davison sent to the LCSB via email.

35.     During a LCSB meeting on March 8, 2016, LCPS parent Linna Walz addressed the board during the public comment period.  She described receiving a No Trespass ban similar to Davison's in response to her entering a Hillside Elementary classroom to demonstrate failure to comply with special education requirements.  She asked LCSB to rescind the ban.  At the following LCSB meeting on March 29, 2016, Linna Walz thanked LCSB and Dr. Patterson for rescinding her ban.

36.     Davison filed a petition for Judicial Review with the Loudoun County Circuit Court on October 28, 2015, within 30 days of LCSB's initial action.

a.     At the circuit court hearing for Davison's petition, LCSB argued the state court lacked jurisdiction because LCSB had not yet issued a "final" decision on the No Trespass ban when Davison filed his petition.

b.     The state court judge dismissed Davison's petition for lack of subject matter jurisdiction.  Davison appealed the State court judge's decision to the Virginia Supreme Court and presently awaits a response.

**DAVISON V. ROSE, et.al**
*Complaint*
Page **25** of **68**

37.    Davison was given very short notice to attend a hastily-constructed LCSB

committee consisting of Defendant Kuesters, Defendant Fox, and Defendant Turgeon on

November 23, 2015 which upheld his No Trespass ban after meeting for thirty minutes in closed

session.

    a.    Davison attended with prepared written information and witnesses but the

committee declined to hear from any witnesses or to review any information.

    b.    Two LCSB committee members admitted they had not yet reviewed the

allegations against Davison but all three unanimously upheld the ban without considering any of

the information Davison provided the committee in email or in person.

    c.    The committee's decision was not reported to the full LCSB until

December 8, 2015, a full sixty-five (65) days after Davison first appealed.

38.    Davison filed a second petition for judicial review on December 22, 2015, within

30 days of the LCSB committee's final decision to ban Davison. LCSB claimed the court was

time barred from considering LCSB's initial September 29, 2015 ban on Davison because the

petition was filed more than 30 days after LCSB's ***initial*** ban.  LCSB asserted the court could

only consider its 3-member committee "final" review of the ban in its judicial review.

39.    In the meantime, Davison has missed most of year children's school year.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE FIRST AMENDMENT

### DEFENDANTS LCSB, HORNBERGER, ROSE, FOX,
### TURGEON, KUESTERS, MORSE, MALONEY, AND DEKENIPP

40.    The allegations of Paragraphs 1-39 are repeated and incorporated herein

41.     At all times referenced herein, Plaintiff was engaged in, or was attempting to engage in, political speech protected by the First Amendment of the United States Constitution as applied to the states by the Fourteenth Amendment.

42.     The Fourteenth Amendment to the Constitution of the United States provides, in part, that "No state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." The Supreme Court of the United States has held that this due process clause "covers a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them." A government action that lacks adequate justification violates the substantive sphere of the due process clause and any person who deprives another of due process of law while acting under the color of law is liable for the resulting compensatory and punitive damages.

43.     Plaintiff's right to join in and participate in public discussions regarding the operation and administration of the public school system of Loudon County, the elected and appointed officials' compliance with regulations and laws, and their compliance with laws regulating and regarding the receipt of public monies is a fundamental right. The First Amendment also provides Plaintiff with the right to peaceably assemble, which is a fundamental right.

44.     The United States Constitution provides Plaintiff with the further protection that he cannot be deprived of his fundamental rights without due process, both pre and post deprivation.

45.     Plaintiff engaged in political discussion regarding the administration of LCPS by LCSB and its elected members and its employed administrators. The issues included matters of

DAVISON V. ROSE, et.al
*Complaint*
Page 27 of 68

local, state and federal concern including the use of federal funds received by LCSB and the

Defendants' compliance with requirements and conditions imposed by virtue of that use.

Plaintiff's protected speech included statements, or attempted to be made, at appropriate public

comment periods of public meetings of LCSB, commentary on the official LCSB social media

page, and comments on the individual official social media pages of individual school board

members.

46.      Defendants LCSB, Hornberger, Rose, Fox, Turgeon, Kuesters, Morse, Maloney,

and DeKenipp, acting under the color and authority of state law, violated and breached Plaintiff's

First Amendment rights by preventing his participation in legitimate public participation in

debates and by censoring and deleting comments he had made in legitimate public forums. The

Defendants further engage in prior restraint by blocking his participation in public forums.

47.      Loudoun residents may sign up to make a public comment at the beginning of

each LCSB meeting. Normally, LCSB allots each speaker between 2-5 minutes to speak on any

topic. Time is counted by a timer and Defendant Hornberger promptly cuts off each speaker at

the expiration of the allotted time.

48.      LCSB does not give additional time if a member of the board interrupts the

speaker or otherwise prevents a speaker from speaking.

49.      Davison signs up to speak at most board meetings. He shows up on time, speaks

when his name is called, and stops speaking when the timer sounds or Defendant Hornberger

cuts him off.

50.      Despite Davison's compliance with LCSB's policy, LCSB and Defendants

Hornberger and Rose have prematurely ended Davison's speaking time on multiple occasions.

51.     One such incident occurred during a public meeting in November 2015 when LCSB was discussing the principles upon which to rezone elementary schools.   Chairman Hornberger has advocated plans that concentrated many of the county's poor and minority students in a few schools and stated it was his firm belief that students should always attend the school closest to the students' home notwithstanding the concentration of disadvantaged students.

52.     Davison remarked that Defendant Hornberger did not scruple to bus children more than five (5) miles in a prior school rezoning decision in order to prevent any busing in the Defendant Hornberger's immediate neighborhood. Defendant Hornberger chastised Davison for speaking when Davison's children's schools would not be affected and then prematurely ended Davison's comments.

53.     In addition to prematurely ending Davison's allotted speaking time, LCSB and Defendants Hornberger and Rose have frequently interrupted Davison's allotted speaking time to call for Davison to be shut down, prevent Davison from speaking, or to express personal dislike of Davison.  Often these interruptions consume substantial portions of Davison's allotted time.

54.     Defendant Fox has repeatedly stated that LCSB's public comments policy is constitutional and Defendant Hornberger has the right to curtail Davison's speech, but Defendant Fox admits the policy is not always enforced by the chairman.

55.     LCSB, Defendant Hornberger, and Defendant Rose's interruptions constituted government actions that restrict speech in a public forum. Such tactics, if left unchecked, allow those in power to effectively silence speakers who raise uncomfortable subjections or take opposing positions.

56.     LCSB's official Facebook page as well as the school board members' "public figure" Facebook pages are the modern day equivalent of the community town square where officials post official information and constituents discuss issues of concern.

57.     Davison posted a number of comments on the LCPS official government Facebook page noting that LCPS students underperformed on an international standardized test (PISA) compared to similarly situated students in every other county, including Mexico. LCSB suppressed Davison's comments so that they would not be publically viewable. When Davison reposted the comments, LCPS once again hid his comments on the government maintained page. Davison recorded LCPS' attempts to hide his posts and informed the public of LCPS' attempted censorship.

58.     LCPS would subsequently ban all public comments on its official government Facebook page throughout the 2015 election cycle. Once the election was complete, LCPS re-opened its Facebook page for public comment. However, on May 10, 2016, LCPS posted a "Terms and Conditions" policy that alleges its Facebook page is a nonpublic forum and public comments are allowed but subject to deletion solely at the discretion of LCPS.

59.     Individual Defendants also engaged in violations of Davison's free speech. After the Richmond City Circuit Court heard arguments in the Davison v VDOE case concerning SGP data, Davison reached out to LCSB members in December 2014 to discuss how to coordinate the public release of the sensitive data. No LCSB member responded.

60.     Davison's continued efforts at communicating with LCSB members were not reciprocated and thus Davison began posting questions and informational links on LCSB member pages including Defendant Hornberger's official Facebook page as the FY16 budget

season kicked into high gear in January 2015.  When Davison posted a question asking

Hornberger why LCPS did not publish the full amount of teacher pay, Hornberger hid the

question from viewers of his Facebook page.  Davison concluded that Hornberger was not being

truthful about his intentions and was attempting to protect his own interests given his wife's (an

LCPS reading specialist) raise would be determined by the FY16 LCPS budget.  Davison

immediately began recording Hornberger's attempts to hide Facebook messages.

61.     Davison's critical comments and public allegations of hidden posts led

Hornberger to stop updating his official Facebook page for three weeks in the middle of heated

LCPS budget discussions, normally the most active time for comments.  Hornberger maintained

the largest Facebook audience among LCSB members and drove most discussions on his

Facebook page.

62.     Hornberger eventually would acknowledge he hid multiple posts from Davison

and issued a "social media comments" policy that provided Hornberger sole discretion over

when posts might be deleted and/or users blocked.

63.     Within just a few days, and following several critical comments by Davison

regarding the LCSB's budget deliberations, Hornberger would permanently block Davison from

posting on his official Facebook page.

64.     Other LCSB members would follow Hornberger's lead as Davison posted

questions on their official Facebook page challenging LCSB's failure to use SGPs as required by

federal law.  Likewise, Defendants Fox, Rose, Turgeon, Kuesters, Morse, Maloney and

DeKenipp deleted and/or hid Davison's critical comments on their "public-figure" Facebook

pages. Davison was largely isolated from the core online conversations regarding LCPS policies

**DAVISON V. ROSE, et.al**
*Complaint*
Page **31** of **68**

such as zoning, grading, and spending and prevented from participating in these key public policy discussions. Defendants Fox, Rose, Turgeon, Kuesters, Morse, Maloney and DeKenipp have also completely banned Davison from any further posting on the "public figure" Facebook pages. These bans amounted to an unconstitutional restriction on Davison's free speech.

65. Here, notwithstanding clear law that require all limitations in these spheres to necessary to a compelling government purpose, LCPS and Defendants Fox, Rose, Turgeon, Morse, Maloney and DeKenipp failed to articulate any reasons for the suppression, deletion, and unqualified ban from all future posting. In addition to clearly lacking any compelling interest, the reasoning of Defendants Hornberger and Kuesters that Davison was being "uncivil" is clearly a prohibited subject-matter, viewpoint-based restriction on Davison's constitutionally protected freedom of speech.

66. The permanent ban that prevented Davison from any further posting constitutes an outright unconstitutional infringement on all Davison's future speech.

67. The bans significantly curtailed Davison's ability to communicate with other engaged citizens and influence educational policy decision in Loudoun solely based on Davison's viewpoint.

68. As a result of the unconstitutional content-based restrictions of LCSB and Defendants Hornberger, Rose, Fox, Turgeon, Kuesters, Morse, Maloney, and DeKenipp, Davison lost the ability to confront officials on misinformation disseminated by LCPS; share information with other residents of Loudoun County; call attention to conflicts of interest among board members; call attention to retaliatory behavior by board members against citizen activists

or participate in discussions of rezoning, budgetary, and other matters that affected Davison and other residents of Loudoun County.

69. Plaintiff has suffered damages, including emotional distress and injury to his reputation as a result of the Defendants' actions. The Defendants acted intentionally for the purpose of censoring Plaintiff's First Amendment speech and they are liable for damages, actual and exemplary.

## COUNT 2
## VIOLATION OF FIRST AMENDMENT /
## RETALIATION

### DEFENDANTS LCSB, STEPHENS, HORNBERGER, ROSE, FOX, TURGEON, KUESTERS, MORSE, SHERIDAN, MALONEY, DEKENIPP AND DEVLIN

70. The allegations of Paragraphs 1-69 are repeated and incorporated herein by reference.

71. Defendants Stephens, LCSB, Hornberger, Rose, Fox, Turgeon, Kuesters, Morse, Sheridan, Maloney, DeKenipp and Devlin, acting under the color and authority of state law, issued to Plaintiff the "No Trespass" notices prohibiting him from coming onto the property of Selden's Landing Elementary School in retaliation of his exercise of his speech protected by the First Amendment.

72. The No Trespass Notice was issued by Stephens. When Plaintiff requested administrative review, the first review was performed by Defendant Patterson, who informed Plaintiff on an October 2015 phone call that she had been directed by LCSB to uphold the ban. Patterson would later clarify her remarks in a May 12, 2016 phone call stating that LCSB had

created and issued the No Trespass letter via a closed meeting with their attorneys. Patterson

further indicated she upheld the ban based on what she believed was the guidance of the LCSB.

A second review was performed by a committee of LCSB members, acting on its behalf. That

committee summarily upheld the ban. Plaintiff requested that LCSB remove the ban with the

reorganization of the School Board in January of 2016 and the LCSB failed to act.

73.     In April of 2016, Plaintiff met with Patterson and Stephens concerning the ban.

Patterson and Stephens both acknowledged Plaintiff had never disrupted student events.

Patterson also told Plaintiff that she did not believe that he was a threat and the ban should be

lifted so that he could attend a concert in which his daughter was participating and other school

year-end events. Patterson reiterated that she had been instructed to deny his October 2015

appeal by LCSB over her objections. (Patterson would later clarify that she did made the

decision based on her understanding of the wishes of LCSB.) However, Stephens expressed

concern when Plaintiff would not agree to forego his right to free speech on Seldens Landing

grounds. The meeting ended and Patterson told Plaintiff she would inform him of the final

decision by phone.

74.     Patterson called Plaintiff approximately 30 minutes later and informed him that

Defendant Stephens would not agree to lift the ban unless Plaintiff agree that he would not

discuss issues concerning the school administration and teacher's performance with other

parents. Plaintiff would not agree to that extortion of his constitutionally protected speech and

the ban was not lifted.

75.     In March 2015, LCSB issued a request via Security Supervisor Devlin to the

Loudoun County Sheriff's Office asking for extreme security restrictions on Davison when

attending public school board meetings. Devlin included a single post made by Davison in an online discussion forum regarding LCPS schools. The post referenced a "target rich environment" with regard to a science fair in which Davison's children were participating and "birdie cards" related to Davison's online Twitter campaign. Davison gained a lot of traction with the parents at the science fair regarding his critique of LCPS' academic performance. Online responses to Davison created minutes after his original post unambiguously and correctly interpreted Davison's remarks as a reference to handing out informational cards at a science fair. However, Devlin's inclusion of Davison's single out-of-context post in her email to LCSO demonstrated an attempt to retaliate mere days after Davison had publicly called for resignations of senior LCPS officials over the PISA results.

76.     LCPS would claim the security request from Devlin via email was exempt under FOIA exceptions but the LCSO provided the entire email communication chain even though LCSO has a policy of asserting all applicable FOIA exceptions.

77.     Defendant Rose called Davison's parents and then had her spouse file a criminal complaint against Davison for publicly criticizing her official actions. When the complaint was found to be frivolous within a couple of days, Rose would lodge complaints against Davison with his employer. Once again, Davison's employer supported Davison's right to free speech and took no political position.

78.     LCSB took steps to tighten its policy barring "personal attacks" after Davison began criticizing LCSB members in January 2015. Defendant Rose would repeatedly call out for Defendant Hornberger to cut off Davison during his public comments at board meetings. The

Virginia Attorney General issued an opinion in April 2016 that described LCSB's modifications to its public comment policies banning "personal attacks" unconstitutional.

79.     On September 29, 2015, one week after Davison asked critical questions in front of 40 parents at a Seldens PTA meeting, LCSB issued a No Trespass ban to Davison barring him from both future Seldens PTA meetings and all student/parent events on Seldens Landing's grounds.

80.     The "Administrative Record" provided to the select LCSB committee reviewing Davison's appeal included a statement from Defendant Devlin. Devlin's statement consisted mostly of hearsay from other LCPS officials including Hornberger and Stephens. Devlin made a knowingly false statement that Stephens had never met Davison prior to a visit by Davison to Seldens Landing office in late January 2015. In fact, Stephens had met Davison at the September 2014 Back-to-School night and even held a 1.5 hour conference with Davison and his child's teachers in Stephens office in October 2014. The week prior to the January 2015 visit by Davison to Seldens, Stephens had emailed Davison to arrange another conference regarding his children's performance and communicated with Davison about several other academic issues. Devlin also made other knowingly false statements regarding Davison allegedly threatening Defendant Hornberger in mid-January 2015.

81.     Prior to the No Trespass ban and the hearsay statement by Devlin in the fall of 2015, Davison had publicly predicted Defendant Devlin would be fired from LCPS within 18 months for misconduct. Davison made the prediction after learning Devlin had conducted unauthorized surveillance on him and had publicly advocated for collecting students' social media comments for an indefinite time period.

82.     LCSB members and LCPS division counsel were aware that Davison maintained a security clearance with the US Department of Defense. LCSB was aware that Davison had never been accused of disrupting student events. LCSB was aware that Principal Stephens had informed Davison he would be banned from Seldens Landing grounds immediately after Davison asked a critical question of Stephens during a September 22, 2015 PTA meeting. LCPS officials solicited negative letters from parents between the September 22, 2015 PTA meeting and the September 29, 2015 No Trespass letter being issued.

83.     LCSB members were aware that the LCSO refused to respond to a call placed by a Seldens Landing employee in response to Davison handing out flyers on public sidewalks in early October 2015. LCSO had deemed the call frivolous.

84.     LCSB members received letters of reference from Seldens parents and an LCPS teacher testifying that Davison had acted appropriately.

85.     Neither LCSB members nor LCPS officials ever interviewed school resource officer LCSO Mark Rodriguez about his observations during numerous Seldens Landing PTA meetings attended by Davison prior to issuing the ban. In the April 28, 2016 meeting, Dr. Patterson informed Davison that Defendant Devlin had been responsible for communicating with LCSO officers prior to his No Trespass being issued.

86.     LCSB member-elect Tom Marshall informed Davison in December 2015 that Marshall saw no rational reason why Davison might be banned from his daughter's chorus concert. After taking office, Marshall informed Davison that he tried to talk with board members about reversing the ban and that despite no board members expressing any safety concerns, no board members were even receptive to discussing the issue to correct LCSB's violation.

87.     Each of these steps taken by LCSB and its members to silence speech was in direct response to Davison publicly criticizing official LCSB acts and LCPS officials directly.

88.     Plaintiff had brought suit against the Virginia Department of Education under the Virginia Freedom of Information Act seeking records relating to the issues which Davison had raised before LCSB. LCSB intervened in that case and opposed Davison's claims. Davison won his FOIA lawsuit against VDOE and LCSB in Richmond City Circuit Court requiring the release of educational effectiveness data. In that trial, VDOE would testify that its log records showed districts including LCPS were not in compliance with federal regulations regarding the use of student growth measures in teacher evaluations.

89.     In the Davison v VDOE case, VDOE officials acknowledged that retesting a small group of students who failed the SOL exams would potentially violate federal privacy regulations known as FERPA.

90.     Far from a public body concerned about safety, LCSB's real concerns related to the withering criticism Davison directed their way:

    a.     LCSB members were aware that Davison had initially prevailed in the Davison v VDOE case seeking LCPS effectiveness data in Richmond City Circuit Court.

    b.     LCSB was aware that Davison had called for resignation of senior LCPS officials after learning of subpar LCPS performance on international PISA tests.

    c.     LCSB members were aware that Davison had publicly accused LCPS attorneys of committing fraud and perjury in Loudoun Circuit Court including posting over twenty-five documents laying out the factual case.

       d.    LCSB members were aware that Davison had accused both LCPS and Principal Stephens of violating FERPA regulations involving SOL retests.

       e.    LCSB members were aware that Davison's FOIA requests demonstrated erroneous information had been provided by LCPS regarding teacher step increases including both the years in which they were given and their actual cost. His critiques resulted in large corrections to information LCPS provided to the public.

91.    Plaintiff has suffered damages, including emotional distress and injury to his reputation as a result of the Defendants' actions. The Defendants acted intentionally for the purpose of censoring Plaintiff's First Amendment speech, retaliating against Plaintiff to inflict emotional harm, and signaling other community members not to engage in similar public criticism of the Defendants. They are liable for damages, actual and exemplary.

**COUNT 3**
**SUBSTANTIVE DUE PROCESS**
**FOURTEENTH AMENDMENT RIGHT TO**
**PARTICIPATE IN EDUCATION OF CHILDREN**

**DEFENDANTS LCSB, STEPHENS, ROSE, HORNBERGER, TURGEON, FOX,**
**KUESTERS, MORSE, MALONEY, SHERIDAN, DEKENIPP, AND DEVLIN**

92.    The allegations of Paragraphs 1-91 are repeated and incorporated herein.

93.    Parents have the "fundamental right to make decisions concerning the care, custody, and control of their children." This fundamental right includes constitutional protection for a parent's right to direct his child's education and to engage his child's teachers. Defendants LCSB, Stephens, Rose, Hornberger, Turgeon, Fox, Kuesters, Morse, Maloney,

Sheridan, DeKenipp, Devlin and Patterson violated Davison's constitutional right to direct the education of his children.

94. If a school excludes a parent from the premises, this restriction must be necessary to ensuring safety and the exclusion must be narrowly tailored to that purpose. Davison provided both Stephens and Patterson with case law (Meyers v Nebraska) to demonstrate the ban was a violation of his constitutional right to engage with his children's teachers.

95. Davison has been an involved parent in his children's education. He has attended parent-teacher conferences every year since his children started school and dialogued with each of his children's teachers regarding his children's academic performance and social comfort at school. He has attended his children's performances and participated in after school events. He's a member of the PTA and participates in fundraisers. Davison even provided additional enrichment activities for his children when they expressed boredom and frustration with the slow pace of instruction at Seldens Landing.

96. Davison has no history of violence and when he attended school events, he went directly to the designated area, stayed within the designated time, and complied with directions of Seldens Landing staff. Davison has never interrupted student events nor has he ever been asked to leave any event he attended.

97. Notwithstanding Davison's long history of active and peaceful participation in his children's education, the Defendants' no-trespass letter barred him from all participation in his children's school including:

      a.     The Defendants prevented him from attending parent-teacher conferences,

      b.      The Defendants intercepted and blocked Davison's request to meet the teachers off campus,

      c.      The Defendants denied Davison's attempted request to discuss his children's instruction with the teachers by phone or email, and

      d.      The Defendants barred Davison from participating in and attending student events during school hours involving his children.

98.      The Defendants had ample information to know that Davison posed no threat to either safety of the school or to student instruction and, as such, the school's no-trespass letter does nothing to promote either. Furthermore, the school's refusal to allow Davison to engage with his children's teachers, even by phone or email, serves no safety purpose whatsoever.

99.      As a result of the school's unwarranted no-trespass letter, Davison has missed a year of his children's education including several first time events he will never be able to celebrate with his children again.

100.      Plaintiff has suffered damages, including emotional distress and injury to his reputation as a result of the Defendants' actions. The Defendants acted intentionally for the purpose of restricting Plaintiff's Fourteenth Amendment right to direct his children's education and they are liable for damages, actual and exemplary. Thus, the Defendants knowingly and willfully deprived Davison of his fundamental right under the color of law and "shall be liable" for such injuries.

**COUNT 4**

## VIOLATION OF FIRST AMENDMENT AND
## SUBSTANTIVE DUE PROCESS-FREE SPEECH PTA MEETINGS

## DEFENDANTS LCSB, STEPHENS, ROSE, HORNBERGER, TURGEON, FOX, KUESTERS, MORSE, MALONEY, DEKENIPP, SHERIDAN, AND DEVLIN

101.    The allegations of Paragraphs 1-100 are repeated and incorporated herein.

102.    Here, Seldens Landing is a public elementary school that is traditionally a non-public forum, but regularly holds a PTA meeting where any member of the community may attend and address issues pertaining to Seldens Landing. By opening up the school as a limited public forum, Defendants LCSB, Stephens, Rose, Hornberger, Turgeon, Fox, Kuesters, Morse, Maloney, DeKenipp, Sheridan, Devlin and Patterson violated Davison's constitutional right to free speech by banning him from PTA meetings

103.    The PTA's by-laws require Seldens Landing's principal to be a member of the PTA's board and Principal Stephens attends each PTA meeting, updates the attendees on Seldens Landing news, and then publicly responds to attendees' questions.

104.    Davison is a member of the PTA, attended several meetings, and frequently raised concerns about school instruction, academic performance, and student privacy.

105.    Neither Seldens' PTA nor the PTAs of other schools have raised any concerns about Davison's participation, but the Defendants have prevented Davison from attending any PTA meetings as the meetings are held at Seldens Landing and the Defendants refuse to allow Davison on Seldens Landing even when the PTA meetings are held after school hours.

106.    As a result of Stephen's No Trespass notice, reviewed and adopted by LCSB, Plaintiff was prevented from participating in PTA meetings and engaging with administration, staff and other parents in discussion pertaining to the education being provided to the students at

Selden's Landing School. Specifically, the ban barred Davison from publicly asking questions

of Principal Stephens in front of other parents similar to the public comment period of LCSB

meetings. The ban imposed upon him did not advance any legitimate interest in protecting the

safety of its students and staff. While schools have a legitimate interest in protecting the safety

of its students and staff, this right is not unlimited and must be reasonable. LCPS' ban was

clearly unreasonable as evidenced by:

        a.      The Defendants failed to identify a legitimate or compelling interest.

Davison had never interfered with student instruction. He abided by the outlined policy when he

attended school events. He never made threats or statements to lead the school to believe he

would be in any way a safety threat to the staff or students. In fact, Davison attended numerous

events at Seldens Landing prior to ban and numerous events at other LCPS schools after the ban

and no incidents were ever reported.

        b.      The ban was neither necessary nor reasonably related to school safety.

Again, Seldens Landing had a sheriff's officer at all the events. There were no incidents nor

allegations of threatened incidents. The officer simply found no cause for concern and was never

questioned by LCPS officials regarding Davison prior to the ban.

        c.      The ban also did not prevent Davison from participating with students and

staff in events held outside of Seldens Landing's premises. It only prevented him from

participating in his children's education, enjoying events with his children, and most critically,

raising public awareness among parents of subpar instruction and legal violations committed by

school officials.

**DAVISON V. ROSE, et.al**
*Complaint*
Page 43 of 68

107.    The ban was not narrowly tailored to protect students and staff. The ban lasted for substantially the entire school year and included school grounds even when school was not in session and students and staff would not be present.

108.    Davison raised each objection to the Defendants on multiple occasions including a separate request to Stephens and Patterson to attend each PTA meeting.  Notwithstanding the fact that the Defendants acknowledged that Davison posed no safety risk and that he has never caused an incident, the Defendants have continued to enforce the ban for over seven (7) months.

109.    In short, this ban has deprived Davison of his right to participate in PTA meetings and other events where parents are allowed to speak, question, or share concerns. The Defendants have continued this deprivation without adequate cause for a period of seven (7) months notwithstanding the recognition that Davison poses no safety concern and the knowledge the ban deprives Davison of his right to speak at public events held at Seldens Landing.   This censorship on speech has caused Davison to seek more costly, but less effective, means of communicating with parents.  It has also prevented parents from pressuring Principal Stephens for improved performance among Seldens Landing staff.  Plaintiff has suffered damages, including emotional distress and injury to his reputation as a result of the Defendants' actions. The Defendants acted intentionally for the purpose of censoring Plaintiff's First Amendment speech and they are liable for damages, actual and exemplary.  Thus, the Defendants knowingly and willfully deprived Davison of his fundamental right under the color of law and "shall be liable" for such injuries.

## COUNT 5
### FIRST AMENDMENT AND
### SUBSTANTIVE DUE PROCESS - ASSEMBLY

### DEFENDANTS LCSB, STEPHENS, ROSE, HORNBERGER, TURGEON, FOX, MORSE, KUESTERS, MALONEY, SHERIDAN, DEKENIPP, AND DEVLIN

110.    The allegations of Paragraphs 1-109 are repeated and incorporated herein by reference.

111.    "The right of peaceable assembly is a right cognate those of free speech and free press and is equally fundamental." *Johnson v. Perry,* 2015 U.S. Dist. LEXIS 142885 Restrictions on assembly and free speech must be reasonable and viewpoint neutral. A school must justify the prohibition "by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 509 (1969). Defendants LCSB, Stephens, Rose, Hornberger, Turgeon, Fox, Kuesters, Morse, Maloney, Sheridan, DeKenipp, Devlin, and Patterson violated Davison's constitutional right to peaceably assemble.

112.    Here, the Defendants have admitted that they do not hold any safety fears regarding Davison's attendance at school events. Rather, the Defendants barred Davison from attending student musical performances, visiting his children for lunch as allowed by Seldens Landing policy, and other student or parent events to prevent Davison from speaking to other parents, in a private fashion, regarding unpopular views and to retaliate against Davison for his public criticism.

113.    An infringement on Davison's constitutional right to assemble in order to prevent him from conversing with other parents is clearly disallowed under long held law. This unconstitutional infringement was known to the Defendants as two members of the LCSB were

DAVISON V. ROSE, et.al
*Complaint*
Page 45 of 68

lawyers at the time of the ban, LCSB is advised by in-house and external counsel, and Davison

emailed copies of relevant case law to all Defendants.

114.    Notwithstanding the Defendant's actual knowledge that they were violating

Davison's constitutional rights without proper purpose, the Defendants ignored the concerns and

continued to utilize the county authority and resources afforded to them by nature of their

positions to deprive Davison's constitutional rights.

115.    Plaintiff has suffered damages, including emotional distress and injury to his

reputation as a result of the Defendants' actions. The Defendants acted intentionally for the

purpose of restricting Plaintiff's First Amendment right to peaceably assemble and they are

liable for damages, actual and exemplary. Thus, the Defendants knowingly and willfully

deprived Davison of his fundamental right under the color of law and "shall be liable" for such

injuries.

### COUNT 6
### PROCEDURAL DUE PROCESS

### DEFENDANTS LCSB, STEPHENS, ROSE, HORNBERGER, TURGEON, FOX, KUESTERS, MORSE, MALONEY, SHERIDAN, DEKENIPP, AND DEVLIN

116.    The allegations of Paragraphs 1-115 are repeated and incorporated herein.

117.    LCSB, Principal Stephens, and Defendants Rose, Hornberger, Turgeon, Fox,

Kuesters, Morse, Maloney, Sheridan, DeKenipp, Devlin and Patterson violated Davison's

Fourteenth Amendment Rights of procedural due process when they deprived him of

constitutionally protected fundamental liberty interests without providing notice or a meaningful

opportunity to be heard prior to the deprivation. The deprived fundamental interests include:

      a.     The right to direct the education of his children including the ability to "engage" with his children's teachers regarding their instruction of his children ,

      b.     The right to enter onto the Selden's Landing property to participate in his daughter's education and engage in peaceable assembly,

      c.     The right of free speech concerning the operation of the Loudon County public school system,

      d.     The right of free speech within the limited public forums created by holding Seldens Landing PTA meetings on school grounds.

118.    The Fourteenth Amendment to the Constitution of the United States provides, in part, that "No state shall . . . deprive any person of life, liberty, or property, without due process of law . . ." At a minimum, procedural due process for fundamental rights requires the individual be provided "notice and opportunity for hearing" before the deprivation.

119.    The post-deprivation "appeal" process provided him was a pretense, sham and hollow, which did not allow him to contest the deprivation of his rights in a reasonable and fair proceeding.

120.    The case law used by the Defendants to justify their unconstitutional ban, *Lovern v. Edwards,* 190 F.3d 648 (1999), was inapplicable to Plaintiff's situation. The Defendants had not received a request from a "custodial" parent that Plaintiff's contact with his daughter at school be prohibited. Plaintiff had not continuously entered school property in clear violation of school policy and interrupted student instruction during his visit. Nor had Plaintiff verbally berated school staff or otherwise caused a disruption during student activities.

121.   Davison has a fundamental liberty interest in directing the education of his children as guaranteed under the Fourteenth Amendment.

122.   This liberty interest includes the right to engage with his children's teachers. The school's unqualified ban of Davison prevented Davison from attending parent-teacher conferences. The school refused Davison's request to meet with his children's teachers at a different location, denied his requests to speak with the teachers by phone, and re-directed all of Davison's emails to his children's teachers. Davison was left with no means to engage his children's teachers even to raise such basic concerns as ongoing problems with the school's math software that prevent his daughter from completing her homework. Further, Davison was precluded from seven (7) months of his children's school activities including his daughter's first chorus concert and several subsequent concerts thereafter, his son's field day, his children's science project, his daughter's *Hansel and Gretel* mock trial, and other school activities such as the PTA fundraiser spooky bingo.

123.   Davison's fundamental liberty interest in directing his children's education was denied without procedural due process.

124.   The right of peaceable assembly is a fundamental right.  Plaintiff was deprived of his right to peaceful assembly guaranteed under the First Amendment, applied to the state under the Fourteenth Amendment, without Due Process of law.

125.   After receiving the No Trespass ban from Stephens in September 2015 without any prior notice or hearing, Davison requested permission to attend numerous student and parent activities on Seldens Landing property in accordance with the letter.  Each and every time

**DAVISON V. ROSE, et.al**
*Complaint*
Page **48** of **68**

Davison requested permission to attend a Seldens event, Principal Stephens and/or Dr. Patterson

denied his request to come onto Seldens Landing property including:

  a.  His daughter participated in the school's chorus program and specifically

asked Davison to attend their school performances in both the winter and spring,

  b.  The PTA's "Spooky Bingo" Halloween fundraiser, an event Davison has

attended with his children in previous year,

  c.  His children's science fair presentation and Field Day events that were

both open to parents, and

  d.  His daughter's Hansel & Gretel mock trial in which the parents served as

the mock jury.

  126. However, Seldens Landing students and teachers did hold two events in a

neighboring school in the spring of 2015 where Davison attended.  A musical concert

highlighting students from elementary, middle and high schools was held at Riverside High

School.  "Wacky Teacher Olympics" was similarly held at Riverside and Davison attended both

events without incident.

  127. Davison's fundamental liberty interest of the right to assemble was denied

without procedural due process.

  128. The right of free speech is a fundamental right.  Plaintiff was deprived of his right

of free speech guaranteed under the First Amendment, applied to the state under the Fourteenth

Amendment, without Due Process of law.

  129. LCSB and Defendants Stephens, Rose, Hornberger, Turgeon, Fox, Morse,

Kuesters, Maloney, Sheridan and DeKenipp violated Davison's Fourteenth Amendment rights by

depriving him of his constitutional right to free speech without procedural due process.

Defendants banned Davison from posting on LCPS's public Facebook page and the board

members "public figure" Facebook pages without any notice or appeal even after the deprivation

had occurred.

130.    Defendants failed to articulate any reasons for the suppression, deletion, and

unqualified ban from all future posting beyond their personal determination that a few of

Davison's comments were "uncivil". In taking such action, amounting to censorship and prior

restraint, Defendants individually served as the sole arbiter in their discretion to determine that

Plaintiff should be silenced.

131.    In addition to clearly lacking any compelling interest, Defendants' rationale for

hiding/deleting posts is clearly a prohibited subject-matter, viewpoint-based restriction on

Davison's constitutionally protected speech and the subsequent permanent ban on Davison from

any further posting constitutes an outright unconstitutional infringement on all Davison's future

speech.

132.    Defendants could not legally restrict Plaintiff's participation in the public forums

sponsored by the local government and maintained by the Defendants as part of their "official"

social media webpages without providing pre-deprivation due process.

133.    Davison's fundamental liberty interest of free speech was denied without

procedural due process.

134.    LCSB and Defendants Stephens, Rose, Hornberger, Turgeon, Fox, Morse,

Kuesters, Maloney, Sheridan, DeKenipp, Devlin, and Patterson further violated Davison's

Fourteenth Amendment Rights by depriving him of his constitutionally protected speech without

procedural due process when Defendants limited Davison's ability to fully engage in public PTA meetings at his children's school.

135.    Davison is the father of two children in attendance at Seldens Landing. He is also a member of the community who speaks at school sanctioned meetings and a member of Seldens PTA who speaks and asks questions at PTA meetings held at Seldens Landing.

136.    During each meeting, PTA members were encouraged to publicly address concerns to the Seldens Landing Principal Stephens, a PTA officer due solely to her position as school principal.

137.    Upon receiving the SGP data specifically designed to gauge school and teacher effectiveness, Davison began to speak out about the low academic growth achieved by Seldens students. Davison noted that among 1142 schools in Virginia with sufficient test scores for analysis, Seldens ranked 899 in math growth. Davison also noted that among students ineligible for free lunch (affluent students), Seldens test scores ranked below LCPS averages in every subject and across every grade. Principal Stephens had opposed Davison's ability to address this performance in both PTA meetings and using school facilities for a community meeting.

138.    After the ban was instituted in September 2015, Stephens set the agenda for the very next PTA meeting to address teacher effectiveness but never addressed Seldens' poor performance with respect to SGPs. This was the very subject on which Davison had been critical. By not granting Davison permission to attend the PTA meeting on school grounds, Stephens blocked a knowledgeable critic of both her and the Seldens teachers' performance from speaking to the very audience that would be most concerned about the issue.

139.    The parents most interested in the school's performance would likely be in attendance at such a PTA meeting. Davison's specific critiques of Seldens Landing's academic performance could very well result in numerous parents mirroring such questions to Principal Stephens and applying pressure for change in policies or personnel. The effectiveness of a school is critical to the education provided to its students. A complete ban is tantamount to an injunction against speech and provides enormous risk of erroneous deprivation without adequate due process.

140.    Davison was blocked from speaking at the PTA meeting of his children's school by Stephens without any pre-deprivation hearing. Stephens was supported in her decision by the full LCSB both before and after the 2015 election.

141.    In considering any legitimate LCPS interests in banning Davison from PTA meetings, the court should consider whether additional measures taken by LCPS were made in good faith.

a.      LCPS had LCSO officers present at all Seldens PTA meetings. This should have been sufficient to allay any security concerns and allow Davison to attend all Seldens PTA meetings. However, the trained law enforcement officer present at the meeting – Officer Mark Rodriguez – never deemed the events at Seldens PTA meetings worthy of filing a report and had never even been interviewed by LCPS officials about conduct at the Seldens PTA meetings. Given the fact that LCSO officers had no concerns about Davison's attendance, it is inconceivable that LCSB or Principal Stephens had legitimate safety concerns. Even with the LCSO officers present, Stephens and LCSB refused to allow Davison to participate in the limited public forums.

51

**DAVISON V. ROSE, et.al**
*Complaint*
Page **52** of **68**

b.    Davison requested permission to attend each of Seldens Landing's

monthly PTA meetings including one held at 6:30pm, well after any students or staff would be

present on school grounds. Yet, even when meetings occurred after school hours and virtually

no teachers were present, Davison was not allowed to attend as a member of the PTA.

142.    A school is traditionally a nonpublic forum but once it has opened its grounds for

PTA meetings - limited public forums - it may not place impermissible limitations on speech.

The school, having created a forum for speech and expression, may not violate Davison's ability

to speak before citizens and parents about matters of public educational concern.

143.    Once again, Davison's fundamental liberty interest of free speech was denied

without procedural due process.

144.    Procedural due process for fundamental rights requires the individual be provided

a meaningful notice and hearing *before* the deprivation occurs.  Furthermore, any government

interest in depriving a citizen of fundamental rights must be weighed against risk of a mistaken

deprivation of those interests in the absence of procedural protections and the probable value of

additional protections.  It is clear that Davison's rights were deprived without any legitimate

government interest:

a.    Davison is a long time member of his community who has never been

accused of violence or a crime other than minor traffic infractions. He has continuously held a

Department of Defense security clearance for over twenty years. He graduated from the

Massachusetts Institute of Technology ("MIT") with a bachelor of science and a master of

engineering, served honorably as a naval officer in the United States Submarine Forces for seven

(7) years before his honorable discharge, and has been gainfully employed since leaving the navy

fourteen (14) years ago. A Loudoun County police officer was in attendance at most events

Davison attended and never found any cause for concern regarding Davison. Davison has never

interrupted student instruction, never been asked to leave the school or any school event, and has

abided by the school's policies. Individuals who observed Davison at different events were

willing to witness to his peaceful conduct. The probable value of a considered and meaningful

hearing would have alieved any concerns regarding Davison's conduct on school premises or

safety risks, and prevented Davison from missing out on an entire school-year of his children's

education.

        b.     Following LCPS' denial of Davison's attendance at his daughter's winter

chorus concert in December 2015, Davison emailed the LCPS rejection email to school board

member-elect Tom Marshall who replied he thought no reasonable person could object to

Davison's attendance. Marshall had previously expressed similar sentiments upon learning that

LCPS had banned Davison from all student events. Marshall would again contact Davison in

April 2016 to express his bewilderment at the continued ban. Given an incoming or newly

installed school board member believed the ban to be patently unreasonable, there is a high risk

of erroneous deprivation of rights. Additional procedural protections would have afforded

Davison the opportunity to enlist Marshall's help or LCSO Rodriguez' testimony before the ban

went into effect. A meaningful pre-deprivation hearing would have concluded the ban to be in

violation of Davison's rights.

       145.    Davison's participation in such school events cannot be recreated after they have

occurred. As a direct and proximate result of the deprivation of procedural due process rights,

Davison incurred damages. He, as a parent of a child of tender years was prohibited from

**DAVISON V. ROSE, et.al**
*Complaint*
Page **54** of **68**

attending meaningful event in their child's life, benchmarks which can never be recovered. His daughter expected her father's support and encouragement but he was denied that true gauge of parenting.

146.     Notwithstanding Davison's constitutional right to speech nor his right to peaceably assemble nor his constitutional liberty interest to direct the education of his children, Principal Stephens failed to provide Davison any notice or hearing prior to serving a full and complete no-trespass. Upon appeal, LCSB, Defendant Fox, Defendant Turgeon, and Defendant Kuesters refused to review Davison's information demonstrating: (a) Davison does not and never has pose a safety risk, (b) Davison has never interrupted student instruction in his numerous visits to school, (c) Davison has never been requested to leave the schools, and (d) Davison has never exceeded the scope of permission during his participation in school events. Davison was not afforded a meaningful hearing on his appeal of the ban. Plaintiff has suffered damages, including emotional distress and injury to his reputation as a result of the Defendants' actions. The Defendants acted intentionally for the purpose of censoring Plaintiff's First Amendment speech and retaliating against Davison for his public criticism and they are liable for damages, actual and exemplary. Thus, the Defendants knowingly and willfully deprived Davison of his fundamental right under the color of law and "shall be liable" for such injuries.

## COUNT 7
## EQUALPROTECTION

### DEFENDANTS LCSB, STEPHENS, ROSE, HORNBERGER, TURGEON, FOX, MORSE, KUESTERS, SHERIDAN, MALONEY, DEKENIPP AND DEVLIN

147.     The allegations of Paragraphs 1-146 are repeated and incorporated herein.

148.    Davison is a resident of Loudoun County, a parent of two children attending

public school, and a member of the PTA. The Defendants deprived Davison of his constitutional

right to equal protection by treating him differently than other (a) residents of Loudoun County,

(b) parents of children of Selden's Landing, and (c) other members of the PTA.

149.    Defendants LCSB, Stephens, Rose, Hornberger, Turgeon, Fox, Morse, Kuesters,

Sheridan, Maloney, DeKenipp and Devlin denied Davison equal protection by treating him

differently than other residents of Loudoun County in exercising free speech on Facebook pages

and at LCSB meetings.  LCSB, Defendants Stephens, Rose, Hornberger, Turgeon, Fox, Morse,

Kuesters, Sheridan, Maloney, DeKenipp and Devlin denied Davison equal protection by treating

him differently than other residents of Loudoun County the after-hours use of public school

grounds.  Defendants also treated Davison differently than other parents of Seldens' students in

exercising the right to peaceably assemble and by treating him differently than members of

Selden's Landing PTA in exercising free speech at PTA meetings.

150.    The School Board encourages residents of the community to attend board

meetings and to share their thoughts in public comment sessions and on the board member's

Facebook pages. In Davison's case, the School Board actively discouraged him from making

comments on their official Facebook pages. Defendants Rose, Hornberger, Turgeon, Fox, and

Kuesters have deleted Davison's comments on their school board Facebook pages in the past.

Defendants Rose, Hornberger, Turgeon, Fox, Morse, Kuesters, Maloney, and DeKenipp have

completely banned Davison from posting on their school board Facebook pages.  Other public

commenters have criticized board members for "failing" to "fully fund" the school budget or for

rezoning certain neighborhoods but their comments were not deleted from official LCSB

**DAVISON V. ROSE, et.al**
*Complaint*
Page **56** of **68**

member Facebook pages. No other citizens have been completely barred from posting on LCSB
member Facebook pages.

151.    Each of these actions by the Defendants to censor Davison's speech represents
fundamentally different treatment than other residents of Loudoun County who are actively
encouraged to speak before the school board as well as ask questions or provide feedback on
school policy. Supporters of higher educational spending in LCPS were praised by school board
members and encouraged to speak at board meetings. Davison frequently criticized policies of
LCSB and their lack of transparency. Davison also used LCPS salary information gleaned from
his FOIA requests to demonstrate LCPS had misstated its compensation policies and
overestimated its budget by more than $6M per year. As a result, LCSB members actively
opposed Davison's efforts to correct misinformation provided by LCPS and he was banned from
posting on Defendant's Facebook pages. Treating a citizen differently because of their
viewpoint is banned under the Equal Protection clause of the Constitution.

152.    The School Board encourages residents of the community and citizens of
Loudoun County to utilize school fields and playgrounds for recreational purposes when school
is not in attendance. Defendant Sheridan has even noted that LCPS does not erect fences around
its property specifically so that the public may make use of the grounds and facilities.

153.    Davison lives within walking distance of three LCPS schools including his
children's elementary school. One of the primary reasons Davison chose to live in a townhouse
was because of the availability of school fields and playgrounds in the immediate vicinity.

154.    The School Board has not only banned Davison from attending events on Seldens

Landing grounds when staff or students are present, but instituted a round-the-clock ban that

even included weekends when no school personnel are present.

155.    Davison has never been accused of disrupting any student event nor has he ever

caused any neighborhood disruptions.  LCSB provided no initial justification for this round-the-

clock ban nor provided any rationale for upholding this portion of the ban during its cursory

committee review.

156.    This LCSB action treats Davison differently than every other parent in Loudoun

County with respect to public resources.  As such, it clearly violates the Equal Protection clause

of the Constitution.

157.    Seldens Landing has numerous events during the school year where parents are

encouraged to attend. There are regularly scheduled parent-teacher conferences and parents can

schedule additional conferences with teachers to discuss concerns about their children's

education. Parents can go to school and eat lunch with their kids without prior notice. Parents

and families are also invited to attend events like spooky bingo, mock trials, field days, and

chorus concerts. The school grounds are open to the public when school is not in session. Parents

drop off their children in front of the school and pick them up afterschool if they have early

morning activities like safety patrol or afterschool activities like chorus.

158.    Defendants prevented Davison from attending all scheduled parent-teacher

conferences and even communicating with his children's teachers via any channel for nearly

seven months. Davison could not take his children to Seldens' "Spooky Bingo", attend his

daughter's chorus concerts held at Seldens Landing, attend his children's Field Days, nor attend

**DAVISON V. ROSE, et.al**
*Complaint*
Page **58** of **68**

his daughter's classroom mock trial. When he needs to take his children to school for early morning activities, Davison must park in the neighborhood and walk them to the school's property line. When Davison needs to drop off a forgotten lunch, pick up his children after the children's afterschool activities, retrieve his children when they are sick or have dentist appointments, he must seek permission well in advance, await Principal Stephen's permission, and wait for a school resource officer to walk the children out of school. In one incident, Davison's daughter had to go without her packed lunch. In another incident, Seldens Landing employees held Davison's children for thirty minutes after all the other children had been released before Principal Stephens frog-marched the children out with two armed police officers wearing bullet-proof vests. On numerous occasions, Davison requested permission to attend parent-teacher conferences or his children's school events but was denied by Principal Stephens and the LCSB.

159.    Davison's permitted school engagement after the implementation of the No Trespass ban stands in sharp contrast to Davison's interactions with his children at Seldens Landing immediately preceding the ban.

160.    The Defendants' action treats Davison differently than every other parent of children enrolled in Seldens Landing with respect to student events. As such, it clearly violates the Equal Protection clause of the Constitution.

161.    PTA meetings are held once a month at Seldens Landing. Parents, PTA members, and members of the community are encouraged to attend and comment. PTA bylaws allow any member of the public to join. Principal Stephens is a PTA board member based solely on her

**DAVISON V. ROSE, et.al**
*Complaint*
Page 59 of 68

position of principal and during each PTA meeting holds an open "Question and Answer" session.

162.    Davison is a parent of Seldens Landing students, a PTA member, and member of the community. He attended PTA meetings both on Seldens Landing grounds and offsite for fundraisers such as Skate Night. The PTA has never excluded him, but he has been prevented from attending numerous PTA meetings on Seldens Landing's property due to the No Trespass letter.

163.    Davison has expressed interest in the academic success and instructional methods employed by school officials. While many PTA meetings focus almost exclusively on how the PTA can raise funds for the school or provide teachers with lunches or gifts, Davison often inquiries about school effectiveness or whether detailed student progress reports like those he requested can be provided to other parents. Davison's questions to Principal Stephens during PTA meetings have sometimes been critical of the school's policy such as refusing to inform parents that student progress reports were available.

164.    Davison has not been alone in questioning school policy however. During the September 22, 2015 meeting in which Principal Stephens warned Davison he would be banned for critical questions, other parents peppered Principal Stephens for nearly 15 minutes regarding why students would not be taking a field trip to Jamestown this year. Principal Stephens would answer each of those parents' questions patiently and completely. However, when Davison asked about FERPA violations, Stephens refused to answer, informed him he would be banned for such questions, and yelled for Davison to halt his exit so she could continue to lecture him.

165.    On April 28, 2016, Davison met with Dr. Patterson and Principal Stephens regarding LCPS allowing Davison to participate in his children's activities going forward. Despite Principal Stephens claiming she was very "open" to criticism, Stephens failed to give her permission for Davison to attend future PTA meetings.

166.    It is abundantly clear that Davison was not banned because of any security threat, rather he was treated differently because he understood the legalities of federal educational regulations and asked critical questions of Principal Stephens.  While other PTA members ask critical questions, only Davison has been banned from Seldens Landing grounds.

167.    The Defendants' action treats Davison differently than every other member of Seldens PTA with respect to attending PTA meetings.  As such, it clearly violates the Equal Protection clause of the Constitution.

168.    The Defendants actions pertaining to Davison in public hearings, Facebook discussions, school activities, and other events held at the school clearly treat Davison different from those of other parents, county residents, members of the PTA, and members of the community. As there is no rational basis for this disparate treatment, the Defendant's actions are in violation of the Equal Protection of the Fourteenth Amendment and the Defendants are liable for damages under 28 USC 1983.

169.    Plaintiff has suffered damages, including emotional distress and injury to his reputation as a result of the Defendants' actions.  The Defendants acted intentionally for the purpose of censoring Plaintiff's First Amendment speech and enacting retaliation for Plaintiff's public criticism and they are liable for damages, actual and exemplary

## COUNT 8
## STATE LAW DEFAMATION

### DEFENDANTS ROSE, STEPHENS, HORNBERGER, AND DEVLIN

170.    The allegations of Paragraphs 1-169 are repeated and incorporated herein.

171.    Following Davison's very public criticism of LCPS officials for violations of federal law and the poor performance of LCPS schools in the spring of 2015, Defendants Stephens, Devlin, Rose, Hornberger and the LCPS attorneys set out to defame Davison in order to blunt his criticism of LCPS and exact retaliation. The defamatory statements and actions were also intended to signal other citizen activists that LCPS officials could inflict damage to any citizen who dared to publicly criticize their official actions or pursue legal remedies for violations of law. The Defendants intentionally claimed Davison posed a danger to the schools, staff and students precisely because Davison's career and his DoD security clearance could be jeopardized. The slanderous and libelous comments are meant to imply that Davison is not fit to engage in his profession, engage in meaningful critiques of LCPS, and were, defamatory per se.

172.    Defendant Rose, in late May of 2015, falsely and maliciously caused a criminal complaint to be filed against Plaintiff alleging that he had threatened her and/or his family. She also at that time contacted Plaintiff's parents and his employer and made similar allegations. Those false statements were repeated and republished in the fall of 2015.

173.    The following year, Defendant Rose once again falsely and maliciously accused Davison of physically targeting her kids again in a public LCSB meeting. In the March 2016 meeting which was permanently recorded and broadcast to citizens of Loudoun and beyond, Rose claimed she "had to talk with her kids" about Davison's harassment and even show her kids

pictures of Davison to protect them. She admitted her husband filed a criminal complaint supposedly based on concern for the "safety" of her children.

174.    In another public LCSB meeting in March 2016, Rose left the dais to complain to an LCSO officer about Davison's critical remarks regarding Rose's intent to segregate low income and minority children via a rezoning action. Rose demanded the LCSO officer remove Davison from the premises of the public meeting solely for his critical public comments. The officer spoke with Davison briefly after Davison had concluded his remarks. Davison left the meeting of his own accord due to prior engagements and the officer took no action with regards to Davison's protected speech.

175.    Rose's actions, however, belie her stated fears. During the criminal complaint, Rose would email Davison to "shepherdize your case" the morning of a public board meeting. Rose also turned to fellow LCSB member and Defendant Morse to laugh and exclaim "I'm not worried" when Davison discussed the possibility of a federal civil rights complaint at a LCSB meeting following the No Trespass ban. An official legitimately in fear for their family's safety would not engage with the alleged perpetrator in such a manner. Rose's outbursts during board meetings reveal frustration with public criticism as opposed to a genuine safety concern.

176.    Defendant Hornberger falsely and maliciously accused Davison of threatening his life in a January 17, 2015 email sent to Hornberger. Bill Fox relayed Hornberger's allegations to Davison in a January 21, 2015 email and would later post these erroneous allegations in online chat forums. Fox alleged that Davison told Hornberger he was "digging your own grave". Davison never made those remarks nor any comments that could be construed in such a manner.

177.    Given Davison's employment required a DoD security clearance, Hornberger's allegations of violent threats would have jeopardized Davison's continued and future employment if DoD security investigators believed Chairman Hornberger allegations as other LCPS officials did in January 2015.

178.    Defendant Hornberger did not generate a signed statement to justify the No Trespass ban against Davison. However, Hornberger's defamatory allegations from January 2015 were relayed by LCPS Security Supervisor Devlin in her official statement contained in the Administrative Record. And one can reasonably infer from Devlin's statement that LCSB discussed Hornberger's January 2015 interactions with Davison in the closed LCSB meetings surrounding the issuance of the ban. As such, Hornberger's false and defamatory statements played a significant role in LCSB's issuance of the ban.

179.    Defendant Devlin falsely accused Davison of making threats against LCPS in March 2015 immediately after Davison called for the resignation of senior LCPS officials due to poor PISA test results. Devlin first requested LCSO ban Davison from all LCSB meetings and then requested LCSO implement extraordinary security measures anytime Davison attended such meetings. To justify these measures, she knowingly took snippets of Davison's online post out of context and claimed it represented Davison's violent intentions.

180.    Devlin also began to investigate Davison, a private citizen, without any authorization. After Davison learned Devlin was reviewing Davison's online profile on sites like LinkedIn, Davison issued a FOIA request for all security-related documents held by LCPS and Devlin. LCPS refused to provide any materials claiming attorney client privilege but in a

parallel request to LCSO, Davison would receive all of the communications between LCPS and LCSO described in paragraph 179 above. Davison would publicly call for Devlin's resignation.

181. Devlin and Stephens also instituted a knowingly unnecessary "show of force" by LCSO on Seldens Landing grounds after the No Trespass ban was implemented in October 2015. Senior official LCSO officials, including Major Fraga, informed Davison they had no concerns about Davison. Thus, LCPS was forced to contract for LCSO officers to patrol Seldens grounds while students and staff were in attendance from approximately October 12, 2015 through at least the end of October. LCSO officers were also stationed on Seldens Landing grounds during morning hours for several additional months and for all off-site, public Seldens Landing activities.

182. The extensive police presence at an elementary school, and Stephens' statements identifying Davison as the basis for the presence, quickly led to fear and rumors among staff and parents regarding Davison's mental stability. Parents who had no interaction with Davison would send letters to LCPS describing Davison as a "wacko nut job" and thanking LCPS for "protecting" staff and students. The false accusations against Davison resulted in lasting damage to his reputation and precluded his ability to organize parents and citizens to effect reform within Seldens Landing and LCPS. In the meantime, Defendant Stephens would acknowledge to certain personnel that LCPS understood Davison presented no physical threat and was only looking to get attention in his community awareness campaign. LCSB, Stephens and Devlin were well aware Davison presented no security threat but committed $10,000's to pay off-duty LCSO officers to impugn Davison's reputation.

64

183.    Defendant Stephens signed all three No Trespass letters issued to Davison. In those letters, she made knowingly false statements about Davison's supposedly "threatening" comments. Stephens enforced the blocking of Davison's communications with his children's teachers including emails from Davison explaining to the teachers he represented no threat. None of Davison's children's teachers generated signed statements in support of his ban. Instead, Stephens included false hearsay statements regarding Davison's behavior in the teachers' classrooms at Seldens' Back-to-School night.

184.    A Seldens Landing employee referred Davison to Child Protective Services (CPS) in October 2015. The CPS officer informed Davison that it was the creation of a flyer criticizing Stephens' violation of FERPA regulations that caused the investigation. Only employees of LCPS, and likely employees at Seldens, possessed direct knowledge of the flyers' distribution. CPS would quickly conclude the referral was frivolous.

185.    Upon learning of the CPS investigation, Davison was cautioned by his ex-wife and parents that retaliation by LCPS could result in both parents losing custody of their children. Davison offered to pay for legal representation for his ex-wife in her discussions with CPS after she expressed fear of unjustified charges. None of Davison's family expressed concern over the accuracy of Davison's claims or the merits of his critiques but became fearful that LCPS could exact revenge for Davison's public criticism. Davison was able to allay their concerns despite considerable emotional distress to both Davison and his entire family.

186.    While Davison had consistently posted all allegations made by LCPS online throughout his awareness campaign, Davison believed the CPS complaint was an attempt to defame him based simply on association with an ongoing CPS investigation. The public would

likely believe CPS had legitimately initiated an investigation regardless of the facts and dismiss

Davison's critiques as that of a "wacko nut job". In fact, education union activists had made

similar false charges in online forums when Davison initially won his SGP suit. Davison also

became concerned that if news of the CPS investigation were to leak, Davison would be unable

to gain any public support from parents with kids in LCPS or teachers employed by LCPS. The

fact that LCPS could target a decorated military veteran with an active DoD clearance would

exacerbate the chill of public speech already created by Davison's No Trespass ban. Thus,

Davison chose not to publicly disclose the CPS investigation until his federal civil rights

complaint was filed.

187.    Stephens' comments to her teachers regarding Davison incited the spouses of

teachers and citizens to write letters requesting additional restrictions on Davison including one

referencing Davison as a "wacko nut job". Some of these authors worked in DoD positions

including one who served as an Army cybersecurity attorney. Given that Davison works in a

DoD/Army IT position, verbal and written attacks by LCSB and Stephens on Davison

represented not only per se defamation, but malicious defamation with the intent to inflict lasting

harm to Davison's career.

188.    LCPS attorneys even accused Davison of being mentally ill or unstable in legal

briefings and oral arguments in court.

189.    The false and defamatory statements of each Defendant were repeated and

republished in the fall of 2015 as manufactured and fictional justification for the issuance of the

"No Trespass" letters.

190.     These statements were false, made intentionally and maliciously for the purpose

of harming Plaintiff so as to silence his political speech or discredit his voice.  The Defendants'

actions were also intended to serve as warnings to any other parents or citizens thinking of

coming to Davison's defense.  Plaintiff suffered damage as a direct and proximate result.

191.     Had the false accusations against Davison resulted in a restraining order or

resulted in a criminal charge of threatening a school official with violence, Davison was subject

to losing his DoD security clearance and his ability to continue with his current career.

192.     Defendants Stephens, Devlin, Rose, Hornberger and the LCPS attorneys made

such statements about Davison posing a danger precisely because Davison's career and his DoD

security clearance could be jeopardized.  The slanderous and libelous comments are meant to

imply that Davison is not fit to engage in his profession and were, defamatory per se.

193.     Plaintiff has suffered damages, including emotional distress and injury to his

reputation as a result of the Defendants' actions.  The Defendants acted intentionally and they are

liable for damages, actual and exemplary

**TRIAL BY JURY IS DEMANDED.**

**<u>PRAYER FOR RELIEF</u>**

Wherefore, Plaintiff demands judgment against Defendants, jointly and severally, in the

amount of $800,000.00 compensatory damages and for exemplary damages in such an amount as

may be supported by the evidence adduced at trial; for attorney fees and costs as provided by

law; for an order enjoining Defendants:  (1) from prohibiting Plaintiff entry onto the property of

LCSB, including Selden's Landing Elementary School and/or from participating in directing his

**DAVISON V. ROSE, et.al**
*Complaint*
Page **68** of **68**

children's education; (2) from blocking Plaintiff from participating in public commentary and

discussions on official social media pages maintained or contributed to by any Defendant and

from deleting or censoring Plaintiff's commentary thereon;  (3) from arbitrarily censoring or

regulating, in violation of the First Amendment; and for such other relief as shall be deemed

appropriate and just upon the evidence adduced and issues joined.

Respectfully Submitted,

BRIAN C. DAVISON

By Counsel

Michael A. Bragg VSB 16797
Bragg Law
P. O. Box 1866
Abingdon, Virginia 24212
276-628-9160
bragglaw@bvu.net

68